FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 JUL 23 AM 9: 47

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| PAUL JOSEPH PETTUS, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV98-H-59-S |
| STEVE BRANNAN, in his individual capacity, | ) | |
| | ) | |
| DEFENDANT. | ) | |

ENTERED

JUL 2 3 1998

## MEMORANDUM OF DECISION

Defendant Steve Brannan filed a motion to dismiss or
alternative motion for summary judgment in this action on April
30, 1998.   The motion was treated as a motion for summary
judgment and deemed submitted, without oral argument, to the
court for decision as of June 2, 1998.  For the benefit of the
pro se plaintiff the court attached a notice and explanation of
Rule 56 of the Fed. R. Civ. P. to its May 6, 1998 submission
order. In support of the motion for summary judgment, defendant
filed his affidavit, supplemental affidavit, certified copies of
court records from other cases and a memorandum of law.  See
Affidavit (attached to April 30, 1998 motion); Supplemental
Affidavit filed May 12, 1998; Memorandum Brief filed April 30,
1998.

On May 26, 1998 plaintiff filed a memorandum brief or
alternative motion for summary judgment.  Plaintiff's motion
seeks summary judgment in his favor on his claims of violations
of his Fourth and Fifth Amendment rights, false arrest, assault,
false imprisonment and malicious prosecution.  Id.  The court's

order established that any evidence to be relied on by plaintiff in opposing the motion for summary judgment must be filed by May 26, 1998.  Plaintiff submitted a belated affidavit of his brother John Matthew Pettus on June 18, 1998.

Plaintiff initiated this action by filing a complaint pro se on January 9, 1998, which he later amended, alleging a variety of facts and legal violations by defendants.[1]  Following the filing of an amended complaint and the court's order construing plaintiff's amended complaint, the remaining claims are against Brannan, in his individual capacity, for the alleged deprivation of plaintiff's Fourth Amendment right to be secure in his person, house, papers and effects against unreasonable searches and seizures and his Fifth Amendment right not to be deprived of his liberty or property without due process of law as a result of a search of the premises located at 275 North Center Street, Birmingham, Alabama 35204.  See April 21, 1998 Order.

Specifically plaintiff alleges that defendant unlawfully entered the Raven Express premises and proceeded with an improper search without a search warrant.  See Amended Complaint at 1-2; May 26 Memorandum.  Plaintiff asserts that defendant confiscated firearms and assaulted him while making an unlawful arrest when plaintiff was simply seeking to assert his rights to secure his person and property.  Id. at 2-3.

---

[1]  Plaintiff originally named the United States and fictitious parties as co-defendants along with Brannan.  The court granted the United States' motion to dismiss these co-defendants both in the original complaint and in the amended complaint.  See April 21, 1998 Order & March 10, 1998 Order.

2

## I.   FACTUAL BACKGROUND

The undisputed facts are set forth below.  These facts are taken almost entirely from Steve Brannan's affidavits due to the plaintiff's failure to submit any verified evidence concerning these matters.  Defendant Steve Brannan serves as a Special Agent for the Federal Bureau of Investigation ("F.B.I.").  Brannan has been assigned to the Birmingham, Alabama office since January of 1984.  On January 8, 1996 defendant Steve Brannan arrived at the business premises of Raven Express on 275 North Center Street, Birmingham, Alabama.  Brannan went to Raven Express in order to serve a subpoena on David Pettus, brother of plaintiff.

While at Raven Express on January 8, 1996 an "incident" took place between Brannan and plaintiff Paul Pettus.  Brannan describes the incident in the ensuing criminal complaint as follows:

> On January 8, 1996, in Jefferson County, Alabama, I was
> attempting to serve a subpoena for David Pettus for the
> trial of USA v. Jesse Shotts, CR95-PT-310-S.  I had
> information that David Pettus was living in a Winnebago
> travel home located in a shop operated by Paul Pettus,
> David Pettus's brother.  The information I had was also
> that David Pettus was trying to avoid service of the
> subpoena.  I had been out to the property once before
> to serve the subpoena, but Paul Pettus said David
> Pettus was not there.  The entire property is
> surrounded by a fence with a gate, but is open to the
> public.  I went to the shop and asked if David Pettus
> was there.  Paul Pettus said no.  I went to the
> Winnebago and knocked on the door.  David's daughter
> answered the door.  Paul Pettus became irate, ran up to
> me and told me I was under "citizen's arrest".  I
> walked to the door.  Paul Pettus blocked the way and
> refused to let me pass.  I sprayed some pepper spray at
> him and he backed out.  He ran to the gate and locked
> it.  I told him to let me out, but he refused.  He said
> I was under arrest.  He also said he was waiting for a
> Birmingham police officer to come.  Other agents and a

3

> Birmingham police officer did come. Although the
> police officer identified himself, Pettus still refused
> to let me out. I arrested him. He was beligerent [sic]
> during this entire time.

After Brannan arrested Paul Pettus on January 8, 1996, John
Matthew Pettus, another brother of plaintiff, indicated to
Brannan that he consented to a search of the Raven Express
premises. Now John Matthew Pettus states that his consent was
not freely given. See John Matthew Pettus Affidavit filed June
18, 1998. According to John Matthew Pettus, "under force of
arms, and threat, duress, and coercion" he consented to the
"continued search" of the Raven Express premises. Id. John
Matthew Pettus states that this consent was given while arms were
drawn and pointed. Id.

Brannan saw a rifle on the premises. Another agent reported
to Brannan that a juvenile female had been seen handling a rifle,
but the female dropped the firearm and fled after the agent
shouted at her. When Brannan asked John Matthew Pettus who owned
the rifle, he responded by saying that the rifle belonged to
David Pettus. Knowing that David Pettus was a convicted felon
who could not lawfully own or possess a firearm, Brannan seized
the rifle. John Matthew Pettus was given a copy of the receipt
for the rifle and told that the FBI would turn the rifle over to
anyone who could prove ownership and was capable of lawful
possession.[2]  No other properly was seized from the premises.

---

[2]  Based on a Firearm Trace Report by the Bureau of Alcohol,
Tobacco and Firearms ("ATF") the rifle seized appears to have
been purchased by Carl McDaniel from Oshmans Sporting Goods in
1977.  See Brannan Supplemental Affidavit filed May 12, 1998.

4

Brannan did not seize a shotgun identified as belonging to plaintiff Paul Pettus.[3]

On January 9, 1998 plaintiff Paul Pettus appeared before United States Magistrate Judge Elizabeth Todd Campbell for an initial appearance. One of the conditions of Paul Pettus's release was that he agreed "to provide access to Raven Express, Inc. in order for the FBI to perfect service on David Pettus." Both Paul Pettus and John Matthew Pettus told Magistrate Judge Campbell that they would allow the FBI access to Raven Express.

According to Brannan, John Matthew Pettus told Brannan that he consented to a search of Raven Express "at any time [Brannan] wanted" either day or night and agreed to make copies of the keys to Raven Express for Brannan's use. John Matthew Pettus promised to meet Brannan with copies of the keys at 3:30 p.m. on January 9, 1996. The planned meeting never occurred.

As Brannan was leaving the courthouse following Paul Pettus's initial appearance and release, he received information indicating that David Pettus was physically present at Raven Express. Brannan arrived on the premises of Raven Express on January 9, then forced entry through a locked door, but seized no property. On January 9, Brannan was unable to locate David Pettus and serve the subpoena. According to Brannan, he had to

_____

According to McDaniel the rifle was stolen from his home in January of 1991 and his insurance company compensated him for the loss. Id.

[3] Plaintiff alleges that defendant seized "firearms" during the search but has presented no proof or details of any firearm being seized, other than the rifle identified by defendant.

5

force entry through the door because it was bolted from the inside, the person who was on the other side of the door would not open it, and there was no other serviceable entrances into that area. Brannan told John Matthew Pettus that the FBI would pay to repair any damage to the door and mailed John Matthew Pettus a claim form for his use in filing a claim for the door damage.

On January 11, 1996 Brannan returned to the Raven Express location in another attempt to locate David Pettus. At that time, John Matthew Pettus gave Brannan a key to the outer gate of the Raven Express area[4] and allowed Brannan to search the premises. Once again Brannan was unable to locate David Pettus and seized no property during the search.

Brannan returned to the Raven Express location on January 16, 1996 and searched the area for David Pettus. Brannan did not locate David Pettus and seized no property during the search. On February 26, 1996, Brannan went to Raven Express and returned the key to John Matthew Pettus. At that time, Brannan conducted no search and seized no property from the premises. Brannan testified that he has not been back to the Raven Express location since February 26, 1996. Brannan never sought nor received a search warrant for the Raven Express premises.

Brannan knows of no claim being filed with the F.B.I. for the cost of repairing the door. Likewise, Brannan does not know

---

[4] The gate key was the only key given to Brannan, even though John Matthew Pettus had promised him copies of all the keys to Raven Express.

6

of any person having contacted the FBI seeking return of the rifle seized on January 8, 1996.

A grand jury indicted plaintiff Paul Pettus on February 1, 1996.  Then a jury convicted him on April 5, 1996 of violating 18 U.S.C. § 111, by forcefully impeding and interfering with a federal officer.  Plaintiff's offense was a misdemeanor and tried before Magistrate Judge T. Michael Putnam.  At sentencing plaintiff was fined $500.00. The district court affirmed plaintiff's conviction.  An appeal of the conviction is pending with the Eleventh Circuit Court of Appeals.[5]

## II.  LEGAL ANALYSIS OF DEFENDANT'S GROUNDS FOR SUMMARY JUDGMENT

### A.  Summary Judgment Standard

Defendant seeks summary judgment in his favor on all claims by plaintiff.  Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

---

[5]  Defendant argues in his brief that to the extent that this action can be interpreted to seek relief from Paul Pettus's criminal conviction it is due to be dismissed for failure to exhaust habeas corpus relief.  Based on this court's interpretation of plaintiff's loosely asserted claims, there are no claims asserting unlawfulness of actions that would render plaintiff's conviction or sentence invalid. Heck v. Humphrey, 512 U.S. 477, 486-87(1994).  Therefore, plaintiff is entitled to proceed with his Fourth and Fifth Amendment claims under a Bivens action even though his criminal conviction is still pending direct appeal.  Id.  Were the court to construe any part of plaintiff's complaint as a challenge of his criminal conviction, then the claims would be premature and not cognizable at this time.  Abella v. Rubino, 63 F.3d 1063, 1065-66 (11th Cir. 1995); Dees v. Murphy, 794 F.2d 1543, 1545 (11th Cir. 1986).

7

material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real

Property, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).    If the
moving party bears the burden of proof at trial, then it can only
meet its initial burden on summary judgment by coming forward
with positive evidence demonstrating the absence of a genuine
issue of material fact; i.e. facts that would entitle it to a
directed verdict if not controverted at trial.    Fitzpatrick, 2
F.3d at 1115.    Once the moving party makes such a showing, the
burden shifts to the non-moving party to produce significant,
probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at
trial, it can satisfy its initial burden on summary judgment in
either of two ways.    First, the moving party may produce
affirmative evidence negating a material fact, thus demonstrating
that the non-moving party will be unable to prove its case at
trial.    Once the moving party satisfies its burden using this
method, the non-moving party must respond with positive evidence
sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not
bear the burden of proof at trial can satisfy its initial burden
on summary judgment is to affirmatively show the absence of
evidence in the record to support a judgment for the non-moving
party on the issue in question.    This method requires more than a
simple statement that the non-moving party cannot meet its burden
at trial but does not require evidence negating the non-movant's
claim; it simply requires the movant to point out to the district
court that there is an absence of evidence to support the non-

9

moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343 (1996).

## B.    Statute of Limitations

Based on the nature of plaintiff's claims, he appears to be asserting a Bivens action.  In Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court recognized a victim's right to bring a suit for money damages in federal court for Fourth Amendment violations by federal officers even though no federal statute expressly authorized such relief.  Miller v. U.S. Department of Agriculture, 143 F.3d 1413 (11th Cir. 1998).

"[A] Bivens action challenges the constitutionality of the actions of federal officials.  'The effect of Bivens was, in essence, to create a remedy against federal officers, acting under color of federal law, that was analogous to the section 1983 action against state officials.  Dean v. Gladney, 621 F.2d 1331, 1336 (5th Cir. 1980). . . .'  Thus, courts generally apply § 1983 law to Bivens cases."  Abella v. Rubino, 63 F.3d 1063, 1064

(11th Cir. 1995).  In order for plaintiff to sustain a <u>Bivens</u>
claim, he must first present sufficient evidence that his
constitutional rights have been violated.  <u>Powell v. Lennon</u>, 914
F.2d 1459, 1463 (11th Cir. 1991).

The statute of limitations governing a <u>Bivens</u> action in
Alabama is based on Alabama's two-year statute of limitations for
all personal injury claims under *Alabama Code* § 6-2-38(1).  <u>See</u>
<u>McKissick v. Busby</u>, 936 F.2d 520 (11th Cir. 1991); <u>Kelly v.</u>
<u>Serna</u>, 87 F.3d 1235, 1238 (11th Cir. 1996).  Generally, a
plaintiff in a <u>Bivens</u> action has two years from the accrual of
his action in which to bring a lawsuit.  The question of when the
statute of limitations begins to run in based on federal law.
<u>Wilson v. Garcia</u>, 471 U.S. 261, 268-71 (1985).

In a case involving alleged deprivations of federal
constitutional rights, the action would accrue when the plaintiff
knows or has reason to know that he has been injured.  <u>Mullinax</u>
<u>v. McElhenney</u>, 817 F.2d 711 (11th Cir. 1987).  In other words, the
action accrues when an event should have alerted the typical lay
person to protect his rights.  <u>Dixon v. Anderson</u>, 928 F.2d 212,
215 (6th Cir. 1991).  In this case, it appears that any alleged
constitutional deprivations resulting from Brannan's entry to the
Raven Express property on January 8, 1996, including the use of
pepper spray on plaintiff, a claim of unlawful arrest or the use
of excessive force during plaintiff's arrest, would have been

11

known and thereby accrued on that date.[6] Therefore, any claims
premised on Brannan's activities and the arrest on January 8,
1996 are outside the two-year statute of limitations because
plaintiff did not file his complaint to initiate this action
until January 9, 1998. Thus, defendant Brannan is entitled to
summary judgment in his favor on any claims premised on alleged
constitutional deprivations occurring on January 8, 1998.

## C. Standing To Pursue Fourth Amendment Claim

Alternatively, even if plaintiff is timely asserting a claim
of unlawful seizure or wrongful retention of the rifle defendant
challenges plaintiff's standing to assert such claims.  As
defendant points out, plaintiff has failed to come forth with any
evidence that he owns the confiscated rifle or has a lawful
possessory interest in the rifle. To benefit from the Fourth
Amendment, plaintiff must show that he had a "constitutionally
protected reasonable expectation of privacy" in the object of the
alleged search.  Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir.
1995)(citing Oliver v. United States, 466 U.S. 170, 177
(1984))(other citations omitted).

> Fourth Amendment rights are personal and may not be
> vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128,

---

[6] The only possible exception might be any Fourth or Fifth
Amendment violation alleged concerning the seizure of the rifle.
Based on the facts submitted, it is ambiguous as to whether
plaintiff was arrested prior to or following the seizure of the
rifle. Plaintiff's knowledge of the seizure of the rifle on
January 8, 1996 remains unclear. Yet, as defendant points out an
action for the unlawful taking of property has a statute of
limitations that begins to run on the date of wrongful
appropriation. See generally, Schaefer v. Stack, 641 F.2d 227
(5th Cir. 1981)(citing Kittrell v. City of Rockwall, 526 F.2d 715
(5th Cir. 1976)).

12

> 133, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). Thus,
> in a variety of circumstances, courts have held that a
> person does not have a reasonable expectation of
> privacy in another's belongings. *See, e.g., id*. at 148-
> 49, 99 S.Ct. At 433 (no standing to object to the
> search of another's car); *United States v. Bella,* 605
> F.2d 160, 161 (5th Cir. 1979)(no standing to complain
> of search of a companion's luggage). . .   This is true
> even when the person claiming the Fourth Amendment
> right has a reasonable expectation of privacy in the
> premises where the other's property was found. . .

Lenz, 51 F.3d at 1549 (footnote omitted).  While a business owner

or operator has a recognized expectation of privacy in the

commercial property under the Fourth Amendment, it is a lower

expectation that the similar expectation of privacy in one's

home.   McLaughlin v. Elsberry, Inc., 868 F.2d 1525, 1529 (11th

Cir. 1988).  Due to the commercial use of the area and the fact

that it was open to the public for business purposes, the court

concludes that plaintiff had only a minimal expectation of

privacy as to the area searched.

The only evidence submitted in relation to ownership of the

confiscated rifle indicates that the legal owner of the rifle is

someone other than plaintiff.  Brannan's affidavit states that

his investigation following a ATF's Firearm Trace Report tied the

rifle to the insurer of Carl McDaniel.  Based on the evidence

submitted, it appears that plaintiff had no reasonable

expectation of privacy in relation to the firearm seized.

Plaintiff's claims relating to any constitutional violation

resulting from Brannan's seizure of the rifle on January 8, 1996

and his retention of the rifle are due to be dismissed on lack of

standing.

## D.   Due Process Claim as to Property Interests

Plaintiff appears to be asserting a Fifth Amendment claim that he was deprived of due process in relation to the deprivation of a property and/or liberty interest.  "To prevail upon [a] procedural due process claim, [plaintiff] must establish: (1) a constitutionally protected interest in life, liberty and property; (2) governmental deprivation of that interest; and (3) the constitutional inadequacy of procedures accompanying the deprivation.  See Lehr v. Robertson, 463 U.S. 248, 256 . . ." Bank of Jackson Co. V. Cherry, 980 F.2d 1362, 1365 (11th Cir. 1993).  A property interest requires plaintiff to show "a legitimate claim of entitlement."  Board of Regents v. Roth, 408 U.S. 564, 570-71 (1972); Bank of Jackson Co., 980 F.2d at 1365.  In relation to the property interest, the plaintiff generally mentions that defendant "without authority and under color of office, seize[d] and confiscate[d] . . . certain lawful firearms in the possession of the plaintiff and lawfully and legally held thereby, and certain personal property belonging to the Plaintiff in his possession."  See Amended Complaint at p.3.

Assuming plaintiff is complaining of defendant seizing the rifle, he has failed to demonstrate any legitimate claim of entitlement to the rifle.  Plaintiff has failed to identify any other property that he was allegedly deprived of without due process by the defendant.  Based on the information provided by the defendant, the court will assume that plaintiff is asserting

14

damage to the door (assuming it was his) as personal property
that he has been deprived of due to Brannan's actions.

Defendant asserts that plaintiff has no viable claim for a
due process violation in relation to property interests because
meaningful postdeprivation remedies exist, such as the filing of
an administrative claim with the F.B.I. or a claim under the
Federal Tort Claims Act ("FTCA"). Plaintiff attached a
Department of Justice form entitled "Claim for Damage, Injury or
Death" dated January 8, 1998 to his original complaint.
Assuming that plaintiff has in fact filed the claim form attached
to his original claim on January 8, 1998, it would be impossible
for him to have allowed for exhaustion of that claim process in
only one day.

The Eleventh Circuit has recognized that when a
postdeprivation remedy is made available "where it is
impracticable for the [federal government] to provide
predeprivation process and if the person who has been deprived of
property can obtain full compensation for his deprivation, he has
received all process he is due." Rodriguez-Mora v. Baker, 792
F.2d 1524, 1526 (11th Cir. 1986); Parratt v. Taylor, 451 U.S. 527
(1981). In Rodreiguez-Mora, the Eleventh Circuit rejected a
federal prisoner's claim that his Fifth Amendment Due Process
rights were violated when the jail failed to return his ring.
792 F.3d 1524. The Eleventh Circuit held that Rodreiguez-Mora's
claims fail because:(1) simple negligence in returning the ring
was not sufficient to state a claim; (2) if defendant was acting

15

within his authorization, then defendant would be immune from
suit, unless his actions violated clearly established law;[7] and
(3) if defendant's actions were unauthorized, then the existence
of a postdeprivation remedy under the FTCA precludes the Fifth
Amendment challenge. `Assuming that plaintiff is asserting
intentional conduct by Brannan and that Brannan acted in an
unauthorized manner, then plaintiff's claim for property
deprivation still fails due to the existence of postdeprivation
remedies through both an administrative claims and a FTCA claim.
The court concludes that plaintiff had available postdeprivation
remedies adequate to redress plaintiff's property right and
plaintiff failed to timely take advantage of this alternative and
exhaust these procedures. Therefore, defendant is entitled to
summary judgment in his favor on plaintiff's Fifth Amendment Due
Process claims in relation to plaintiff's property rights.

## E.    Qualified Immunity

Defendant asserts that any alleged wrongful conduct
occurring as a result of his accessing the Raven Express location
after the initial appearance of plaintiff on January 9, 1998 is
subject to a qualified immunity defense. Brannan has presented
verified evidence that as a condition for plaintiff's release
both plaintiff and John Matthew Pettus, plaintiff's surety on the
bond, agreed to provide access to Raven Express in order for the

---

[7]    Defendant relies on claims of qualified immunity for any
Fifth Amendment Due Process claims involving liberty interests.

16

FBI to perfect service on David Pettus.[8]  See Attachment to
Motion to Dismiss or Summary Judgment.  Defendant bases his claim
of qualified immunity primarily on this court order.  However,
the court will also consider defendant's assertion of qualified
immunity in relation to those claims set forth in plaintiff's
motion for summary judgment.

Qualified immunity is a protection from liability when a
government officer is performing a discretionary function and his
actions did not violate clearly established statutory or
constitutional rights that are sufficiently clear to allow a
reasonable official to understand that what he is doing violates
that right.  Lancaster v. Monroe County, Alabama, 116 F.3d 1419,
1424 (11th Cir. 1997); Anderson v. Creighton, 483 U.S. 635, 640
(1987).  The very action in question need not be held unlawful,
but in the light of pre-existing law the unlawfulness must be
apparent.  Anderson, 483 U.S. at 640 (other citations omitted).

The court agrees with defendant that the decision of where,
when and how an F.B.I. Special Agent is to serve a subpoena
involves the performance of a discretionary function.
Considering the terms of plaintiff's release and its express
authorization for defendant to enter the Raven Express premises
for the purpose of locating David Pettus, the court also

---

[8]  This formal consent by way of a court order appears to be
separate and apart from the alleged oral consent given by John
Matthew Pettus.  Because plaintiff disputes defendant's assertion
that John Matthew Pettus freely consented to a search by an oral
statement to defendant, the court assumes no oral consent was
given by John Matthew Pettus and does not rely on such consent as
part of the rulings contained in this order.

17

concludes that a reasonable F.B.I. Agent would not have known
that accessing the area in an attempt to locate David Pettus
violated clearly established law. Therefore, defendant Brannan
is entitled to qualified immunity as to his actions in accessing
the Raven Express area on the afternoon of January 9, 1996;
January 11 and January 16, 1996.

On the basis of the two-year statute of limitations the
court has previously disposed of any claims based on events
occurring January 8, 1996. Alternatively, the court will look to
the circumstances surrounding the search and arrest complained of
on January 8 to determine if it was objectively reasonable for
Brannan to conclude that the search and arrest were supported by
probable cause or exigent circumstances. More appropriately, the
court must consider the information possessed by Brannan and the
activities occurring at that time to test the reasonableness of
his conduct.

"An officer is entitled to qualified immunity where the
officer had 'arguable probable cause,' that is, 'where reasonable
officers in the same circumstances and possessing the same
knowledge as the Defendant[] could have believed that probable
cause existed to arrest the plaintiff[].'" _Thornton v. City of
Macon_, 132 F.3d 1395, 1399 (11th Cir. 1998)(quoting _Von Stein v.
Brescher_, 904 F.2d 572, 579 (11th Cir. 1990). Similarly, the
issue of qualified immunity in relation to a warrantless search
and seizure turns on whether there was "arguable" probable cause.
_Eubanks v. Gerwen_, 40 F.3d 1157, 1160 (11th Cir. 1994).

18

In his May 26, 1998 response, plaintiff alternatively moves for summary judgment in his favor as to: (1) his Fourth and Fifth Amendment claims; (2) false arrest without probable cause; (3) assault with force of arms; (4) false imprisonment and (5) malicious prosecution. For purposes of this motion the court will assume that the four torts listed above are subsumed in plaintiff's general Bivens action for unreasonable search and seizure or deprivation of liberty and property without Due Process. It would appear that any Due Process claims involving deprivation of plaintiff's liberty interests would necessarily involve the arrest and warrantless search discussed below.

After reviewing the evidence before the court, many, if not all, of plaintiff's claims appear to rely on a determination of probable cause. The assault, false arrest and false imprisonment claims all appear to arise out of plaintiff's arrest on January 8. Plaintiff's indictment and conviction under 18 U.S.C. § 111 for forcefully impeding and interfering with a federal officer, that followed the January 8 arrest, appears to be the subject of the malicious prosecution claim.

It is undisputed that defendant came onto the premises of Raven Express in order to serve a subpoena on David Pettus and met with resistance by plaintiff Paul Pettus. Brannan had received reports that David Pettus was living in a Winnebago travel home on the Raven Express business premises and was trying to avoid service of the subpoena.

Brannan went to Raven Express and asked plaintiff if David

19

Pettus was on site.  Plaintiff gave a negative response.  When Brannan returned to Raven Express on January 8, 1996, his efforts to access a travel home where David Pettus reportedly lived were hampered by plaintiff.  Plaintiff Paul Pettus blocked the way and refused to let defendant pass into the opened door of the motor home.

After Brannan sprayed plaintiff with pepper spray to allow access to the travel home, plaintiff ran and locked the gate surrounding the area.  Then plaintiff refused to let defendant out of the gated area.  Once the City of Birmingham Police Officer summoned by plaintiff came to the area and identified himself, Pettus still refused to let Brannan out of the gate. Plaintiff Paul Pettus acted in a belligerent manner toward Brannan during this entire incident.  Based on the foregoing undisputed facts, the court concludes that Brannan had arguable probable cause to conduct a warantless search of the Raven Express business premises, detain plaintiff and arrest him.

Furthermore, based on this evidence it appears undisputed that defendant had probable cause to seek an indictment and assist in the prosecution of plaintiff for impeding and interfering with a federal officer pursuant to 18 U.S.C. § 111.[9] An individual need not assault the officer to violate Section

---

[9]   Although plaintiff challenges the existence of probable cause in relation to his arrest, he does not appear to dispute the existence of probable cause for his indictment and prosecution.  Even assuming that plaintiff challenges the probable cause for his prosecution, plaintiff has failed to present any evidence to create a disputed issue as to any material fact in the face of his conviction.

111.  <u>United States v. Hernandez</u>, 921 F.2d 1569, 1577 (11th Cir.

1991).  In fact, a person can violate Section 111 without any

physical contact.  <u>Id.</u>  With probable cause undisputed, plaintiff

cannot prevail on his claims of malicious prosecution.[10]  Thus,

defendant alternatively is entitled to summary judgment in his

favor on any constitutional claim by plaintiff premised on

malicious prosecution and entitled to qualified immunity as to

the warrantless searches.

     "It is clearly established that the use of excessive force

in carrying out an arrest constitutes a violation of the Fourth

Amendment."  <u>Thornton</u>, 132 F.3d at 1400 (citing <u>Graham v. Connor</u>,

490 U.S. 386, 394 (1989)).  In order to determine if the amount

of force used is reasonable, the court must look to the facts and

circumstances of this case, including the severity of the crime

at issue, whether the suspect poses an immediate threat tot he

safety of the officers of others, and whether he is actively

resisting arrest or attempting to evade arrest by flight.

Brannan will be entitled to qualified immunity if the court

---

[10]     Alternatively, any claim based on malicious
prosecution would also fail due to the absence of any favorable
termination for plaintiff.  According to the United States
Supreme Court, "[o]ne element that must be alleged and proved in
a malicious prosecution action is termination of the prior
criminal proceeding in favor of the accused."  <u>Heck v. Humphrey</u>,
512 U.S. 477, 484 (1994). Plaintiff has failed to allege or prove
a favorable termination of his criminal conviction.  Plaintiff's
misdemeanor criminal conviction was affirmed by the United States
District Court.  There has been no termination of his criminal
conviction that is favorable to plaintiff.  In <u>Heck</u> the Court
referred to the principle that a malicious prosecution claim does
not accrue until the criminal proceedings have terminated in the
plaintiff's favor.  512 U.S. at 489.  Therefore, plaintiff's
claim involving malicious prosecution is also due to be dismissed
on this alternative ground for failure to state a claim.

concludes that his actions were "objectively reasonable" --"that is, if a reasonable officer in the same situation would have believed that the force used was not excessive." Thornton, (citing Anderson, 483 U.S. 635 (1987)).

The only type of force mentioned by plaintiff as "excessive" was Brannan's spraying of plaintiff with pepper spray. According to the evidence presented, Brannan was attempting to enter the area where David Pettus was suspected of living and plaintiff refused to step aside and allow Brannan to enter the area. Clearly use of pepper spray in and of itself is not necessarily excessive. As another court has pointed out, "pepper spray is generally of limited intrusiveness. It is designed to disable a suspect without causing permanent physical injury — which is what appears to have happened here because the [plaintiff] [has] presented no evidence that [he] suffered any physical injury." Griffin v. City of Clanton, 932 F. Supp. 1359, 1369 (M.D. Ala. 1996).

In this case plaintiff has presented no evidence, nor even allegations, of any ongoing physical injury that resulted from his arrest or use of the pepper spray. Furthermore, defendant resulted to use of pepper spray only after plaintiff refused to honor defendant's requests that plaintiff step aside to allow defendant entry into the motor home. Based on the evidence submitted, the circumstances surrounding plaintiff's arrest and Brannan's use of pepper spray indicate that the use of force was reasonable and provides Brannan with qualified immunity from

22

liability for Constitutional violations alleged in relation to the "assault," unlawful arrest and unlawful imprisonment.

Pursuant to the foregoing conclusions, defendant is entitled to summary judgment on all of plaintiff's claims.  Plaintiff's motion for summary judgment is due to be denied.  A separate order will be entered.

DONE this $\underline{\phantom{2}23^{rd}}$ day of July, 1998.


SENIOR UNITED STATES DISTRICT JUDGE

23